**Ronda NUNNALLY, Appellant/Cross–Appellee,**

v.

**Phillip GRAHAM, et al., Appellees,**

and

**E. Scott Frison, Jr., Appellee/Cross–Appellant.**

Nos. 09–CV–505, 09–CV–506.

District of Columbia Court of Appeals.

Argued Jan. 10, 2012.

Decided Nov. 21, 2012.

Ajmel Quereshi, with whom Aderson B. Francois, Supervising Attorney, Howard University Law School (Civil Rights Clinic), and Brittany A. McCants, New York, NY, La'Vonda McLean, and Fathia Touray, Student Attorneys, were on the brief, for appellant Nunnally.

E. Scott Frison, Jr., Washington, pro se.

Jay P. Holland, with whom Brian J. Markovitz, Greenbelt, MD, was on the brief, for appellee Graham.

Andrew Van Brisker, Assistant Attorney General, District of Columbia, with whom Irving B. Nathan, Acting Attorney General at the time the brief was filed, and Todd S. Kim, Solicitor General, and Donna M. Murasky, Washington, were on the brief, for appellee District of Columbia.

Before WASHINGTON, Chief Judge, BECKWITH, Associate Judge, and REID, Senior Judge.

REID, Senior Judge:

In this employment discrimination case, filed by appellant/cross-appellee Ronda Nunnally and resolved by a jury verdict in favor of appellees Phillip Graham and the District of Columbia, we are faced with an appeal by Ms. Nunnally, and a cross-appeal by appellee/cross-appellant E. Scott Frison, Jr., Ms. Nunnally's former lawyer. Ms. Nunnally's appeal involves the following questions: (1) whether the trial court erred by failing to admit into evidence (a) an investigative report prepared by a unit of the Metropolitan Police Department ("MPD"), and (b) MPD's entire "exit letter" (rather than a redacted copy) relating to administrative action taken in response to Ms. Nunnally's complaint against Mr. Graham; (2) whether the trial court erred under the law of the case doctrine by dismissing Mr. Graham, in his individual capacity, from the lawsuit; and (3) whether the trial court erred by giving incomplete instructions to the jury. Mr. Frison's appeal raises the question whether his attorney's fees issue is properly before this court.

We affirm the trial court's judgments in Nos. 09–CV–505 and 09–CV–506.

## FACTUAL SUMMARY

The record shows that in July 2001, Ms. Nunnally, a lieutenant in the MPD, was moved to MPD's Information Technology Division, which later became the Office of the Chief Information Officer ("OCIO"). MPD hired Mr. Graham, a computer scientist, in or around September 2002; he became Chief Information Officer ("CIO") in January 2003. Mr. Graham created four deputy positions in December 2003 and designated Ms. Nunnally as one of his deputies.

Later, in May 2004, Ms. Nunnally filed an Equal Employment Opportunity ("EEO") complaint against Mr. Graham under Title VII of the 1964 Civil Rights Act; she alleged that Mr. Graham sexually harassed her and subjected her to a hostile work environment. Jacqueline Johnson, Manager of MPD's Diversity and EEO Compliance Unit, investigated the complaint and sent a report to MPD's Police Chief on December 16, 2004, recommending that Ms. Nunnally's "sexual harassment allegation be sustained," and referring the matter to the Chief of Police "for disciplinary action." MPD terminated Mr. Graham in March 2005.

Prior to MPD's resolution of her EEO complaint, Ms. Nunnally filed a civil action in the Superior Court against Mr. Graham and the District of Columbia, on July 30, 2004, alleging sexual harassment and retaliation under the District of Columbia Human Rights Act ("DCHRA"). She lodged an amended complaint in September 2004; and a second amended complaint in December 2004. A trial judge granted Mr. Graham's July 2005 motion to dismiss the second amended complaint against him; hence, he was effectively removed as a defendant in his individual capacity. Nevertheless, Ms. Nunnally filed a third amended complaint (referred to in part of the record as a second amended complaint)

on September 25, 2007, more than two years after Mr. Graham had been dismissed, claiming sexual assault and sexual battery, as well as gender and sexual orientation discrimination, sexual harassment, hostile work environment, and retaliation under the DCHRA, and including Mr. Graham as a defendant in his individual capacity. The second trial court judge assigned to the case reinstated Mr. Graham as a defendant in his individual capacity. A third trial judge granted Mr. Graham's December 4, 2007, motion to strike or in the alternative to dismiss the September 25, 2007, third amended complaint; the motion was granted pursuant to Super. Ct. Civ. R. 15(a) and (c), in part because the third amended complaint was time barred and did not relate back to the original complaint.

The case proceeded to trial, in April 2009, on Ms. Nunnally's sexual harassment, hostile work environment, and retaliation claims against the District. The jury responded "no" to each of the following three questions: (1) "[D]o you find that plaintiff has proven by a preponderance of the evidence that plaintiff was subjected to unwanted sexual advances by Phil Graham"; (2) "Do you find by a preponderance of the evidence that defendant, District of Columbia, unlawfully subjected the plaintiff, Ronda Nunnally, to a hostile work environment on the basis of her sex"; (3) "Do you find by a preponderance of the evidence that defendant, District of Columbia, retaliated against plaintiff, Ronda Nunnally, because of her protected activities in violation of D.C. Human Rights Act?" Consequently, the trial court entered judgment in favor of the District.

## ANALYSIS

### MS. NUNNALLY'S APPEAL

#### The Investigative Report

Ms. Nunnally argues that the trial court committed reversible error by failing

to admit into evidence MPD's entire investigative report, as a party admission, business record, or public record. The District maintains that the trial court did not abuse its discretion by refusing to admit the entire report because it does not constitute a party admission, and because Ms. Nunnally failed to lay the proper foundation for the admission of the entire report as a business record or public record. The District further contends that even if the entire report were admissible as a party admission, business record, or public record, the trial court did not err in excluding it because its probative value would have been substantially outweighed by its prejudice to the District, had it been admitted. Ms. Nunnally responds, in part, by insisting that the District "adopted" the investigative report, as evidenced by its reliance on the report to fire Mr. Graham, and further, she claims the District "held up [the report's] existence (without ever letting the jury know what it actually said) as proof that the District acted in good faith in investigating [Ms.] Nunnally's complaint." She also maintains that a limiting instruction could have mitigated any prejudicial impact flowing from the report.

Before setting forth the legal principles that will guide our analysis of this issue, we summarize the investigative report and the trial court's discussion and rulings pertaining to the report. The report, prepared by Ms. Johnson, Manager of MPD's Diversity and EEO Compliance Unit, consists of sixty-six single-spaced pages, providing background information on Ms. Nunnally, and details about her complaint against Mr. Graham, obtained during Ms. Johnson's interview with Ms. Nunnally. The report contains a summary of taped interviews with approximately twenty-five persons, including seventeen individuals whose names were provided by Ms. Nunnally; several police officers or administrators; and Mr. Graham. In addition, there is an analysis of Ms. Nunnally's complaint, and other evidence, under Title VII of the Civil Rights Act of 1964. The report closes with three relatively short sections: 1) "Lack of Judgment" (with eight summary statements); 2) "Statement of Facts" (with eighteen summary statements); and 3) "Recommendation." Most of the persons interviewed did not indicate that they witnessed any inappropriate behavior between Ms. Nunnally and Mr. Graham; some of these persons reported what they had heard from Ms. Nunnally or others, or what others had heard from yet other persons. Three of those interviewed said they witnessed some touching of Ms. Nunnally by Mr. Graham that they considered inappropriate. Ms. Johnson recommended that Ms. Nunnally's "allegation of sexual harassment be sustained to support a violation of Title VII of the Civil Rights Act of 1964, as amended, and a violation of MPD's General Order 201.9, Equal Employment Program." She also "referred" the matter "to the Chief of Police for disciplinary action."

According to Ms. Nunnally, and reiterated by her at trial, the incidents began in April 2003 with very subtle comments by Mr. Graham. His conduct soon escalated to sending inappropriate cartoons, emails and text messages to Ms. Nunnally; unannounced visits to her home with gifts; constant demands that she join him for walks, lunch, dinner or drinks; groping of her thighs and other parts of her body; and demands for hugs, forced hugs, and other inappropriate touching.

An issue concerning the investigative report was raised on the first day of trial. Prior to Ms. Nunnally's opening statement, the District asked the trial judge to prevent her counsel from reading parts of the report, especially the recommendation about the Title VII violation. Ms. Nunnally argued that the investigative report con-

stituted an admission by the District, and hence, she should be allowed to tell the jury that the report recommended termination of Mr. Graham for the Title VII violation. After extensive discussion, the trial court ruled that Ms. Nunnally's counsel could mention the investigative report in his opening statement, but that since the report had not yet been admitted into evidence and the District had objected to Ms. Nunnally's trial exhibits, including the report, counsel could not read from the report, and could not usurp the function of the jury by reciting the recommendation about the violation of Title VII of the Civil Rights Act. In his opening statement, Ms. Nunnally's counsel stated that the jury would "hear from the District that they conducted an internal investigation ... [and the District] recommended that [Mr.] Graham ... violated [MPD's] sexual harassment policies."

During the testimony of Ms. Johnson, the issue of the investigative report's admission into evidence again surfaced when Ms. Nunnally moved to admit the report into evidence. The trial court sustained the District's objection. The court stated that MPD conducted an internal investigation, "[i]t was not a quasi-judicial proceeding." Furthermore, declared the trial judge, the jury in this case did not hear from all of the persons interviewed by Ms. Johnson, and hence, the jurors "have no way to judge the credibility of [those interviewed]." The judge also observed that the report contained a lot of hearsay; and admission of the report would "chill" or dissuade agencies from conducting the type of investigation made by Ms. Johnson since the report could be "wave[d] in front of the jury" without being "test[ed]." Nevertheless, despite its refusal to admit the entire investigative report into evidence, the court permitted Ms. Johnson to indicate that: (1) "the District of Columbia fire[d][Mr.] Graham as a result of Ms.

Nunnally's complaint of sexual harassment made against him"; and (2) Ms. Nunnally was not "fired as a result of her complaint of sexual harassment made against Mr. Graham"; rather, she "was detailed from the IT department to major narcotics, pending the outcome of the investigation."

The only person interviewed for Ms. Johnson's report who testified at trial on behalf of Ms. Nunnally was a supervisory information technology specialist who worked with Ms. Nunnally. She recounted one incident involving Mr. Graham, and one comment he had made to Ms. Nunnally. The District called one other person who had been interviewed for Ms. Johnson's investigative report, an MPD employee who described an incident between Ms. Nunnally and Mr. Graham that she had witnessed.

■■■ We are guided by the following legal standards and principles. "The admissibility of evidence is committed to the sound discretion of the trial court, and this court will not disturb its ruling absent an abuse of discretion." *Walker v. United States,* 982 A.2d 723, 734 (D.C.2009) (citing *Kidd v. United States,* 940 A.2d 118, 129 (D.C.2007)) (internal quotation marks omitted). Moreover, "[e]videntiary rulings by a trial court are highly discretionary decisions that will be upset on appeal only upon a showing of grave abuse." *Wood v. Neuman,* 979 A.2d 64, 74 (D.C.2009) (internal quotation marks and citation omitted).

■■■ Under Federal Rule of Evidence 801(d)(2), which this court has adopted, a statement by an opposing party "is not hearsay" if it (A) "was made by the party in an individual or representative capacity"; (B) "is one the party manifested that it adopted or believed to be true"; (C) "was made by a person whom the party authorized to make a statement on the

subject"; (D) "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed"; or (E) "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(A) through (E). If any one of these conditions is met, the statement is considered as a party admission or adoptive admission. *See Harris v. United States*, 834 A.2d 106, 116 (D.C.2003); *see also Wilson v. United States*, 995 A.2d 174, 183–85 (D.C.2010). Rule 801(d)(2)(B) "does not require an explicit statement of adoption; all that is necessary is some manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements." *Harris, supra*, 834 A.2d at 117 (internal quotation marks and citations omitted). "[S]tatements are admissible as adoptive admissions so long as there is sufficient evidence from which a jury could reasonably conclude that the defendant unambiguously adopted" another's statement. *Wilson, supra*, 995 A.2d at 185 (citing *Blackson v. United States*, 979 A.2d 1, 8 (D.C.2009)). One "factor [used to] support[ ] a finding of adoption is the extent that the adoptive party accepted and acted upon the evidence." *Harris, supra*, 834 A.2d at 117 (citing *Pilgrim v. Trustees of Tufts Coll.*, 118 F.3d 864, 870 (1st Cir.1997)) (internal quotation marks and other citations omitted).

Nevertheless, an admission is subject to exclusion "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R.Evid. 403; *Harris, supra*, 834 A.2d at 116. " 'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis." Fed.R.Evid. 403, advisory committee's note. *See also Hunter v. United States*, 980 A.2d 1158, 1164 (D.C. 2009) ("relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice") (internal quotations and citation omitted); *United States v. Kattar*, 840 F.2d 118, 131 n. 10 (1st Cir.1988) ("party-opponent admission is still subject to the trial court's balancing of its probative value against its prejudicial effect under Rule 403").

In *Wright–Simmons v. The City of Oklahoma City*, 155 F.3d 1264 (10th Cir. 1998), an employee in the Personnel Department of the city's Metro Transit Department investigated a discrimination complaint, compiled a report and attached notes from interviews conducted with thirteen current and former employees of the transit department. The City Manager met with the alleged discriminating employee and advised him that he would be fired if he did not resign. The court held that the report and notes were admissible into evidence, and that "neither the two-page report nor the attached notes are hearsay."[1] *Id.* at 1269. The court explained that the City Manager "would not have sought [the discriminating employee's] resignation had he not believed [the

---

1. In *Wilson, supra*, a case involving an issue as to whether the admission of a video and audio surveillance tape violated appellant's Confrontation Clause rights, we noted that our case law treated a party admission "as an *exception* to the rule against hearsay." 995 A.2d at 183, n. 8 (emphasis in original) (internal quotations and citation omitted). However, in discussing the Confrontation Clause issue, we declared, "we believe it is appropriate to utilize the federal framework of analysis— i.e., the rule that a statement adopted as a party-admission is *not* hearsay (rather than the rule of our case law that party-admissions are admissible under an *exception* to the hearsay rule)." *Id.* (emphasis in original) (citations omitted).

Personnel Department] report," that the City Manager "relied" on the report and interview notes, but that the manager "need not have believed every statement in the report to reach the conclusion that [the discriminating employee] should resign" because the decision to ask for the resignation "goes to the weight of the evidence rather than its admissibility." *Id.*

Similarly, in *Pilgrim, supra,* a university employee in the Center for Environmental Management ("CEM") filed a grievance against his supervisor, alleging racial and national origin discrimination under Title VII of the Civil Rights Act of 1964. The appropriate arm of the university conducted an investigation and compiled a report recommending, in March 1991, that the supervisor be relieved of all his supervisory duties, that another person be designated to supervise the employee, and that "an independent overseer be appointed to monitor the new reporting relationship." The university president approved the recommended action. Subsequently the employee was terminated in June 1991, after his position was deemed "superfluous" due to budgetary constraints that resulted in the termination of ten CEM employees. 118 F.3d at 866–68, 870. The case ultimately reached the federal District Court in Massachusetts, where the employee sought to attach the investigative report to his motion for summary judgment. The District Court excluded the report as " 'a collection of multi-level hearsay statements.' " *Id.* at 869. On appeal, the First Circuit reiterated that Rule 801(d)(2)(B) provides that "[a] statement is not hearsay if . . . [the] statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief

in its truth. . . ." *Id.* at 870. The court concluded that because the university president had implemented all of the recommendations contained in the investigative report, he "would not have carried this out unless he accepted the Report's conclusions as the truth"; therefore, "his acceptance of the contents of the Report and his implementation of its recommendations, without disclaimer, served as an adoption of the Report for the purposes of Rule 801(d)(2)(B)." [2] *Id.*

One other case is instructive, *Mister v. Northeast Illinois Commuter R.R. Corp.,* 571 F.3d 696 (7th Cir.2009). There, a railroad employee was injured in a fall on snow or ice while at work, and he sued his employer. A safety officer for the railroad corporation prepared a handwritten report of the accident after speaking with two persons who had not witnessed the occurrence. The safety officer's report also referenced another employee's fall "a week earlier in the same spot." *Id.* at 697. The District Court judge excluded the report from evidence on the ground that it was not based on the safety officer's personal knowledge, and therefore, it was unreliable and based on multiple layers of hearsay. The Seventh Circuit concluded that the report was admissible under Rule 801(d)(2)(D), observing that the Rule 801(d)(2) "call[s] for generous treatment of party-opponent admissions." *Id.* at 699.

In the case before us, the Diversity and EEO Compliance Unit was part of the MPD, and hence, there was an agency relationship between MPD (and the District) and that unit. Ms. Johnson, the manager of the compliance unit, compiled the investigative report of Ms. Nunnally's

---

**2.** Nevertheless, the court concluded that the Report would not have been helpful to the employee because most of it concerned conduct outside the limitations period, and because the grievance committee "reported that

they were unable to find any 'substantive evidence that [the supervisor] intended to discriminate against [the employee] on the basis of race, color [or] national origin.' " 118 F.3d at 871.

complaint as part of the scope of her employment and regular duties with MPD. She sent her report to the Chief of Police through the Assistant Chief of Police, the head of MPD's Office of Professional Responsibility. Ms. Johnson recommended that Ms. Nunnally's allegation of sexual harassment by Mr. Graham be sustained as a violation of Title VII of the Civil Rights Act of 1964. The Police Chief took action by terminating Mr. Graham from his position at MPD. By taking the termination action, MPD, an agency of the District government, "manifested a belief in the truth" of the investigative report. *Wright–Simmons, supra,* 155 F.3d at 1268. That action constituted an admission by an opposing party. In addition, even though the District did not believe that Ms. Nunnally had demonstrated that she was entitled to monetary damages, it asserted that it had taken appropriate action by investigating Ms. Nunnally's sexual harassment complaint against Mr. Graham and by terminating Mr. Graham after concluding that he was involved in an inappropriate relationship with Ms. Nunnally, albeit a consensual relationship. Thus, the District "unambiguously adopted" Ms. Johnson's investigative report as well as MPD's resulting adverse action against Mr. Graham, within the meaning of Rule 801(d)(2)(B).[3] *Wilson, supra,* 995 A.2d at 174 (citing *Blackson, supra,* 979 A.2d at 8). Moreover, under Rule 801(d)(2)(D), Ms. Johnson's recommendation was made in her capacity as an agent of MPD (and the District) "on a matter within the scope of that relationship and while it existed." *See Mister, supra,* 571 F.3d at 699 ("The district court erred when it did not classify the [investigative] report as an admission by a party opponent under Rule 801(d)(2)(D)").

Although we conclude that the investigative report and subsequent MPD termination of Mr. Graham constituted an admission by the District within the meaning of Fed.R.Evid. 801(d)(2)(B) and (D), we must also determine whether the exclusion of the report subjected Ms. Nunnally to unfair prejudice, or whether the probative value of the report would be substantially outweighed by the danger of unfair prejudice to the District. *Hunter, supra,* 980 A.2d at 1164; *Kattar, supra,* 840 F.2d at 131 n. 10. As the court said in *Mister, supra,* "[a]lthough there are rules that call for the generous treatment of party-opponent admissions . . ., they still do not stand for the proposition that Rule 801(d)(2) trumps *all other* Federal Rules of Evidence." 571 F.3d at 699 (emphasis in original) (internal quotation marks omitted). Citing Fed.R.Evid. 403, the *Mister* court concluded that the safety officer's investigative report was "a non-hearsay report that is derived from multiple levels of hearsay." *Id.* That court also declared: "Although it would have been proper to admit the report and allow [the railroad corporation] to expose the statement's unreliability on cross-examination, it was not improper to find the report unreliable based on multiple levels of hearsay and lack of precise factual statements." Therefore, "the district court did not abuse its discretion when it barred [the] report, and the accompanying testimony about its contents." *Id.* Other factors to be used in the balancing process to determine unfair prejudice are whether admission of the report would risk "confusing the issues, misleading the jury . . . or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

**3.** Because of our conclusion that the investigative report and the resulting termination action constituted an admission by the District, we need not consider whether the trial court should have admitted the report as a business record or as a public record.

Here, the record shows that Ms. Nunnally sought to introduce the entire investigative report. The District complained that she "want[ed] to circumvent putting on a case before th[e] jury [by having] the jury . . . rely on all of the witnesses' testimony that was given to Ms. Johnson," but Ms. Nunnally "could have called in each and every one of the witnesses that Ms. Johnson interviewed that [she] identified as a potential witness for her claim." Instead of doing that, the District claimed, Ms. Nunnally wanted the jury to "believe" that Ms. Johnson had talked to the potential witnesses, had "gotten information," and "if she found there was some evidence of harassment, then it must be true." The District also maintained that since "the investigation . . . determined that there was some evidence of harassment under Title VII, it's more prejudicial to the jury to hear that because that's what [the jury has] to determine based on the evidence they have before them in this court and [the report] . . . should not be admitted in its entirety if the court is going to admit it at all at this point."

Ms. Nunnally countered that the report was relevant because of the District's defense—that it had a policy against sexual harassment and had taken "appropriate remedial action" against Mr. Graham. Moreover, the report would show that the District "determined that the behavior of [Mr.] Graham violated [its] own sexual harassment policy." It would help to refute the District's defense that "Ms. Nunnally invited the sexual advances of Mr. Graham and that Ms. Nunnally somehow derived some gain by doing so." Furthermore, Ms. Nunnally asserted that Ms. Johnson interviewed . . . 27 people," and compiled a "66–page report . . . [that] took six months of time," but "[t]here is not a single shred of evidence in [it] that any person said that Ms. Nunnally made up her complaint."

On this record, we cannot say that the trial court abused its discretion by excluding the sixty-six page investigative report. Pages 1–19 of the report contained background on Ms. Nunnally as well as her detailed account of Mr. Graham's actions. Pages 20–52 summarized the statements of persons interviewed during Ms. Johnson's investigation, including Mr. Graham. From pages 52–64 Ms. Johnson analyzed Ms. Nunnally's complaint and the interview results under Title VII of the Civil Rights Act of 1964. Pages 64–65 listed instances of Mr. Graham's "lack of judgment." Pages 65–66 set forth eighteen "statement[s] of fact," and Ms. Johnson made her recommendation on Page 66.

The jury may well have been confused or misled by Ms. Johnson's extensive analysis of Ms. Nunnally's complaint and the witness interviews under Title VII of the Civil Rights Act of 1964. Both Title VII and the District of Columbia's Human Rights Act prohibit employment discrimination, and the jury may have thought that it should conclude, as had Ms. Johnson, that Ms. Nunnally's sexual harassment complaint was meritorious. In addition, the information in the investigative report contained "cumulative evidence." For example, both Ms. Nunnally and Mr. Graham testified along the lines reflected in the report, and the trial court admitted emails from Mr. Graham to Ms. Nunnally and from Ms. Nunnally to Mr. Graham, dating from June 2003 to May 2004, that are discussed in the report. And due to its exclusion, jurors were not aware that the vast majority of those interviewed did not personally witness any inappropriate behavior on Mr. Graham's part. Thus, we cannot say that Ms. Nunnally was unfairly prejudiced by the exclusion of the report. Significantly for the defendants, had the entire report been introduced, approximately twenty witness statements would

have been admitted without an opportunity for cross-examination, and these statements often were based on multiple levels of hearsay. Moreover, had the entire investigative report been admitted, the jurors may have been subjected to an extensive mini-trial on the sixty-six page report. The trial judge excluded the report because the jurors "ha[d] no way to judge the credibility of" persons interviewed by Ms. Johnson during the investigation, admission of the entire report could negatively impact agency investigations, and the report contained a lot of hearsay. Given the case law we have cited in this opinion and our analysis, on this record we are unable to conclude that the trial court abused its discretion by excluding the entire investigative report.[4] *See Johns v. United States*, 434 A.2d 463, 473 (D.C. 1981) ("even though relevant, the evidence should not be admitted if certain countervailing circumstances outweigh probative value, *e.g.*, prejudice, confusion of the issues, cumulative testimony, undue delay"); *Mister, supra*, 571 F.3d at 699.

### The Exit Letter

█ The District objected when Ms. Nunnally sought admission of the one-page exit letter from Ms. Johnson informing Ms. Nunnally that MPD "has taken final administrative action" regarding her complaint against Mr. Graham. During a bench conference, the District objected to the following sentence and asked that it be redacted: "An investigation conducted jointly by the Diversity and EEO Compliance Unit and the Internal Affairs Division determined that there was sufficient evidence to support your claim of discrimination based on your gender (sexual harassment) and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended." The trial court granted the District's motion to redact the sentence pertaining to the violation of Title VII, reasoning that the jury in this case should base its verdict on the evidence admitted at trial, and not on MPD's investigation of Ms. Nunnally's administrative complaint. As the trial judge put it, the sentence in the exit letter concerning the Title VII violation "speaks to a set of facts that's not before this jury"; and "whatever evidence either side decided to put on [at trial] . . ., that's what the jury should base its decision on." The judge concluded that admission of the entire exit letter with a limiting instruction would not "cure" the problem.

Ms. Nunnally contends that by redacting the sentence about the Title VII violation, "the trial court permitted the [d]efense to create in the minds of jurors the misleading impression that the letter's sole purpose was to show that an investigation had occurred and not to support a finding of sexual harassment and retaliation." Ms. Nunnally maintains that: "Had the jury been permitted to see that MPD had not just conducted an investigation, but also concluded that [Mr.] Graham violated Title VII, it would have drawn the inference that [he] violated not just MPD policy but also sexually harassed and committed a hostile work environment for [Ms.] Nunnally." Thus, she argues, "[b]y failing to admit the complete letter into evidence, the trial court denied [Ms. Nunnally] a fair opportunity to present a complete picture to the jury and, therefore, committed harmful reversible error of law." We disagree with Ms. Nunnally's argument.

---

4. Ms. Nunnally suggests in her reply brief that the trial court could have given a limiting instruction to mitigate any prejudicial effect caused by admission of the entire investigative report. We do not believe that the record reflects any request for a limiting instruction by Ms. Nunnally. Nor does the record indicate that Ms. Nunnally sought to introduce less than the entire investigative report.

In essence, Ms. Nunnally complains that the trial court failed to apply the rule of completeness and that failure resulted in unfairness to her. We recently had occasion to consider the rule of completeness in *Diggs v. United States*, 28 A.3d 585 (D.C.2011). We made clear that there is no "automatic right to insist" that when part of a statement is introduced into evidence, "the other parts [must] be admitted too, simply because they are favorable to [her] position." *Id.* at 597. "Rather, the rule contemplates that other parts of the statement should be admitted, in the trial court's discretion, when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact." *Id.* (internal quotations omitted). In this case, the redacted sentence was not necessary to explain or place the entire exit letter in context, and as the trial court indicated, the redacted sentence may have prompted the jurors to believe that the District already had determined that Ms. Nunnally was sexually harassed and that they should reach the same conclusion. Indeed, Ms. Nunnally openly argued that the Title VII sentence in the exit letter would have enabled her to show that Ms. Nunnally was subjected to sexual harassment and a hostile work environment. As such, we cannot agree that the trial court abused its discretion by redacting the exit letter, or that it committed harmful reversible error. Ms. Johnson was permitted to answer "yes" to the question, "did the District of Columbia fire Phil Graham as a result of Ms. Nunnally's complaint of sexual harassment made against him?" Thus, the jury knew that MPD had terminated Mr. Graham because of Ms. Nunnally's complaint.

### Dismissal of Mr. Graham as a Defendant in His Individual Capacity

Ms. Nunnally asserts as harmful error the dismissal of Mr. Graham as a defendant in his individual capacity. She complains that the law of the case doctrine did not permit the trial judge to override the earlier ruling of another judge that Mr. Graham could be sued in his individual capacity. The record shows that the first trial judge assigned to this case dismissed Mr. Graham as an individual defendant. The second judge first denied Ms. Nunnally's motion to reinstate Mr. Graham as an individual defendant and later granted Ms. Nunnally's motion for reconsideration.[5] The third trial judge determined that the first judge's dismissal of Mr. Graham constituted law of the case and that reinstating him was improper. Moreover, the third judge also concluded that the third amended complaint claims "are time barred and do not relate back pursuant to [Super. Ct. Civ. R.] 15(c)."

In the context of this case, the issue presented is whether the third trial judge erred by not adhering to the reinstatement ruling made by the second trial judge. Generally, under the law of the case doctrine, a trial judge would adhere to a ruling made on the same question of law decided by a prior judge. *Kumar v. District of Columbia Water & Sewer Auth.*, 25 A.3d 9, 13 (D.C.2011). Significantly, the law of the case doctrine "is discretionary"; "[i]t merely expresses the practice of courts generally to refuse to reopen what has been decided, [and is not] a limit to their power." *Crane v. Crane*, 614 A.2d 935, 939 n. 12 (D.C.1992) (internal quotation marks and citation omitted).

---

5. In light of our analysis of the issue involving Mr. Graham, we consider it unnecessary to determine the applicability of *Purcell v. Thomas*, 928 A.2d 699 (D.C.2007), a case cited by the second trial judge in deciding to reinstate Mr. Graham as a defendant in his individual capacity.

Under our case precedent, the third trial judge had the power to consider whether Mr. Graham should be reinstated as a defendant in his individual capacity, and we discern no abuse of discretion.[6]

Another reason compels us to reject Ms. Nunnally's argument concerning the reinstatement of Mr. Graham. As the third trial judge recognized, the third amended complaint was time barred under Super. Ct. Civ. R. 15(a) and pursuant to Rule 15(c) did not relate back to Ms. Nunnally's original complaint. She specifically based the assault and battery intentional torts in her third amended complaint, alleged for the first time on September 25, 2007, on events that commenced in Spring 2003 and ended on May 12, 2004. These intentional torts are governed by a one-year statute of limitations. We considered a comparable issue in *Stewart–Veal v. District of Columbia*, 896 A.2d 232 (D.C.2006). We concluded that "when the trial court dismissed [plaintiff's] May 2003 complaint, without prejudice, the one-year statute of limitations on her intentional torts was no longer tolled, and because the statute of limitations had expired as of mid-November 2003, the June 17, 2004 dismissal of the May 2003 complaint was effectively with prejudice." *Id.* at 237–38 (internal quotation marks and citation omitted). We are confronted with the same situation here because "the statute of limitations had expired on [Ms. Nunnally's] intentional torts before she filed her [third] amended complaint," and the intentional tort claims "no longer were viable when she filed" that

complaint on September 25, 2007. *Id.* at 238.

### The Jury Instructions

■■■ Ms. Nunnally complains that the trial court committed plain error by giving an incomplete jury instruction regarding the defense theory of the case. She argues that the "error was highly prejudicial to [her] case leading to her deprivation of a fair trial." Neither Mr. Graham nor the District challenges the trial judge's instructions, and the District contends that Ms. Nunnally has no standing to challenge the instruction pertaining to the defense theory of the case.

Prior to giving the jury final instructions, the trial judge read to counsel its proposed instructions relating to the defense theory about the retaliation claim.[7] Ms. Nunnally's counsel objected without stating why the proposed instructions constituted error. When Ms. Nunnally's counsel said he would make objections after the instructions were given, the trial court asserted, "it's helpful to know beforehand." After the trial judge gave jurors her final instructions, and before they retired to deliberate, Ms. Nunnally's counsel again objected to the defense theory instruction, as well as to other instructions, saying only, "Plaintiff objects to the following instructions: Defendant's theory of the case, each instruction relating to sexual harassment." He added, "I don't believe I heard a hostile work environment instruction," specifically the "protected class element." Counsel also contended that the

---

6. In addition, we have stated previously that "an order denying a motion to dismiss ... is an interlocutory and not a final order and that a final judgment is required to sustain the application of the law of the case rule." *Kumar, supra,* 25 A.3d at 14 (citing *Washington v. Government of District of Columbia,* 152 A.2d 191, 192 (D.C.App.1959)) (internal quotation marks omitted).

7. The preliminary instruction read as follows: "[T]he defendant's theory is that the plaintiff has not proven that she was not subjected to retaliation because she was transferred from the Information Technology office [sic], but that the District had a legitimate business reason for separating the plaintiff and Mr. Graham."

retaliation instruction was not given. The trial court reminded plaintiff's counsel of the preliminary retaliation instruction, but the District's counsel declared: "I don't think that was read." The trial court replied, "I cut out a lot." After the jury retired, plaintiff's counsel again objected generally "to the instruction on the Defendant's theory of the case," "the instruction relating to the law on retaliation," and other instructions that are not at issue in this appeal.

"[O]bjections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis." *Knight v. Georgetown Univ.*, 725 A.2d 472, 482 (D.C.1999) (internal quotation marks and citations omitted). "A party's failure to register a sufficiently precise objection limits the scope of our review to plain error." *Id.* (citation omitted).

Here, Ms. Nunnally made only a general statement, primarily limited to the fact that she objected to the judge's defense theory instruction, and the sexual harassment, hostile work environment and retaliation instructions. Consequently, she recognizes that our review is limited to plain error. Given the trial court's broad discretion in fashioning jury instructions, and in light of our review of the instructions as a whole, we see no error, let alone plain error. "[C]onsidered as a whole, [the instructions] fairly and accurately state[d] the applicable law." *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997) (internal quotation marks and citation omitted).

After telling the jury that "[t]he defendant's theory is that the plaintiff is not entitled to recover damages on her claim of sexual harassment or retaliation," the judge twice gave the jury instructions about the hostile work environment claim. In fact, the trial court initially correctly informed the jury about that claim, including the fact that Ms. Nunnally "is a member of a protected class." Nevertheless, because of plaintiff's counsel's statement that he did not hear the instruction, the trial court repeated the part about the protected class before the jury retired to deliberate. The court also explained the elements of the sexual harassment claim. In addition, the court gave a detailed explanation of the retaliation claim, including the element of "an adverse employment action," telling the jury, in part, "you must consider whether the preponderance of the evidence establishes ... that the defendant imposed an adverse employment action on the plaintiff after she was assigned—or when she was assigned to the Major Narcotics Unit." Thus, although the court did not repeat the verbatim preliminary instruction it had shared with the parties about the "transfer[ ] from the Information Technology office," the actual instruction was clearer and virtually equivalent to the preliminary instruction since Ms. Nunnally was transferred from the IT office to the Major Narcotics branch.[8]

In short, on this record, we cannot agree that the trial court committed error, let alone plain error, by giving incomplete instructions to the jury. *See Thomas v. District of Columbia*, 942 A.2d 645, 650 (D.C.2008) (Plain error requires that appellant establish "(1) error (2) that [was] plain, (3) that affect[ed] substantial rights, and (4) the error seriously affect[ed] the fairness, integrity, or public reputation of

---

8. Defendants did not object to the trial court's articulation of their theory of the case, but we are not persuaded that Ms. Nunnally did not have standing to challenge that part of the trial court's instructions to the jury, because she asserted that the challenged instructions were highly prejudicial and deprived her of a fair trial.

the judicial proceedings.") (internal quotation marks and citation omitted).

## MR. FRISON'S APPEAL

■ The record reveals the following context for Mr. Frison's appeal. In late November 2008, and prior to trial in this case, Ms. Nunnally terminated Mr. Frison as her lawyer. Sometime around December 1, 2008, Ms. Nunnally petitioned the District of Columbia Bar's Attorney Client Arbitration Board ("ACAB") for arbitration of her fee dispute with Mr. Frison. On December 8, 2008, Mr. Frison sought to intervene in the present case and to assert a demand for legal fees in the amount of $242,832.34, covering his representation of Ms. Nunnally in four cases, including the one now before us. On January 5, 2009, the trial court denied Mr. Frison's motion to intervene, on the ground that he cited no legal authority to support his intervention. After the jury rendered its verdict in this case on April 23, 2009, Mr. Frison filed a notice of appeal, on May 26, 2009, identifying as one of the issues, "[w]hether Frison/Intervener is entitled to legal fees for representing [Ms.] Nunnally's interest in the case below."

Before the ACAB, Mr. Frison demanded fees in the amount of $115,384.61, and Ms. Nunnally requested $30,000.00. The ACAB awarded Ms. Nunnally $11,000.00 on May 5, 2009, and made no award to Mr. Frison. Ms. Nunnally filed a complaint on June 11, 2009, requesting confirmation of ACAB's award in the Superior Court of the District of Columbia (CA–4233–09), and the trial court confirmed the award on August 3, 2009. However, Mr. Frison filed a motion to vacate the ACAB award and the judgment confirming the award (CAB–3769–09). The trial court denied Mr. Frison's motion as moot and granted Ms. Nunnally's motion to dismiss Mr. Frison's action. Mr. Frison filed an appeal.

This court summarily affirmed the trial court's order (in CAB–3769–09) on February 28, 2011, noting that Mr. Frison's only alternatives were to appeal the trial court's August 2009, order denying Mr. Frison's motion to dismiss (in CA–4233–09) or to lodge a motion to vacate the judgment (in CA–4233–09).

In response to Mr. Frison's motion to vacate arbitration award under Super. Ct. Civ. R. 60(b) (filed in CA–4233–09), the trial court denied the motion on April 29, 2011, rejecting Mr. Frison's arguments that the ACAB lacked subject matter jurisdiction, and that Ms. Nunnally committed fraud on the court by failing to notify the Judge–in–Chambers that Mr. Frison had other actions pending in Superior Court. Mr. Frison lodged an appeal (in CA–4233–09) on May 12, 2011.

We conclude that in the case before us (CAB–5963–04), there is no trial court judgment relating to the merits of Mr. Frison's request for attorney's fees; nor does Mr. Frison cite any specific trial court order from which he is appealing. Although his notice of appeal identifies as an issue, "[w]hether Frison/Intervener is entitled to legal fees for representing Nunnally's interest in the case below," his notice cites no issue as to whether the trial court improperly denied his motion to intervene to litigate his legal fee. Moreover, on this record we cannot say that the trial court abused its discretion by denying Mr. Frison's December 8, 2008, motion to intervene for the purpose of seeking his legal fees. In addition, we previously summarily affirmed the trial court's judgment confirming the arbitration award to Ms. Nunnally (in CA–4233–09), and we see no basis for disturbing that ruling. In short, we are satisfied that Mr. Frison is collaterally estopped from raising in this appeal

his attorney's fees issue, an issue that was "actually litigated" before the ACAB and "determined by a valid, final judgment on the merits ... after a full and fair opportunity for litigation by the parties." *Modiri v. 1342 Restaurant Grp., Inc.,* 904 A.2d 391, 394 (D.C.2006) (internal quotation and citations omitted).

Accordingly, for the foregoing reason, we affirm the judgments of the trial court in Nos. 09–CV–505 and 09–CV–506.

*So ordered.*